Mr. Elliott, you may proceed. May it please the court, Honorable Justices, Counsel, my name is Nick Elliott and I am representing the appellant, Douglas Miller, who is here today with us. This appeal is brought today based upon the denial of a petition to terminate maintenance. Mr. Miller sought to terminate maintenance based upon his former wife, Tammy Miller, cohabitating with Paramore on a resident continuing conjugal basis. The trial court in Iroquois County denied this petition and it is our position that that denial was against the manifest weight of the evidence. Section 510C of the Element of Marriage and Dissolution of Marriage Act states that the obligation to pay future maintenance is terminated if the party receiving maintenance cohabitates with a person on a resident continuing conjugal basis. The court is to look at whether or not a continuing conjugal relationship exists if there is a de facto husband and wife relationship. And the test here is the totality of the circumstances. The Heron Court 30 years ago gave us a number of factors to look at in order to help consider the totality of the circumstances. We have the length of the relationship, the amount of time spent together, the nature of the activities they engaged in, the interrelation of the personal affairs, whether they vacation together and whether they celebrate holidays together. And this court traditionally has followed those six factors, the Heron factors, and first adopted it really in Snow in 2001. And just as no two relationships or marriages are alike, no two maintenance termination or cohabitation cases are alike. And when we look at this case in particular, in view of the Heron factors, we've got a relationship here between Tammy Miller and Francois Hulterman that lasted over four years, from November of 2017 until January of 2022. Now, they briefly broke up in the spring of 2021. They revealed that in their depositions, but then got back together very briefly thereafter after the depositions finished. It was Francois Hulterman who testified in February of 2022 that the parties had broken up in January. He indicated that at that time he had a new girlfriend, but struggled to recall the girlfriend's last name. This length of the relationship is very similar to cases that have found a gay factor marriage. In fact, it's greater than most. In the Heron case, two and a half years. In Snow, a year and a half. In Walther, from the third district in 2018, two years. And in Churchill, the latter case, three and a half years. The trial court seemed to minimize the length of this relationship simply because it had allegedly ended. Now, with all due respect to the trial court, I think that's a very slippery slope and a dangerous ride to take. First... Mr. Elliott. Excuse me. Sure. I looked through the trial record. I don't see any of the documents that were admitted into evidence as part of our record. Okay. Where are those exhibits and why were they not tendered as part of your record? Your Honor, I apologize for that. They should have been part of the record that was submitted. The only exhibits that are in our system have to do with records from a temporary hearing, I believe, with regard to tax return and a W-2 and the like. Okay. But in your transcript, you specifically refer to exhibits, somethings received in evidence, et cetera, but it's never been submitted to us. I apologize for that. That must have been an error. Okay. Thank you. The Walter Court in this district has made it clear that just because a relationship ends, it doesn't negate the fact that that relationship existed in the first place. Logically, that makes sense. Marriages end. Marriages of 5 years, 10 years, 20 years. In fact, if a marriage didn't end, we wouldn't be here today. And so to simply state that because a relationship ended, that length of time is negated, it essentially opens up a trap door for any case like this where the payee can simply end the relationship and escape a petition to terminate matrons. The trial court also found that the amount of time that Mrs. Miller-Tammy and Francois spent together did favor the finding of a de facto marriage. There was testimony from Francois Holterman that when first presented with the question, he stated that he saw her every day and that he stayed overnight there five to six nights per week. What impact do you believe Francois' brain injury had on his testimony? Little, to be honest, because when first posed with the question, and this is seen in the transcript, the very first time he was posed with that question in the deposition, automatic answer was five or six nights per week. Now, he went down to three or four nights per week at the time of the hearing, but I would suggest that that movement from five to six to three to four was based on some further questioning that had been done by Mrs. Miller's counsel. So to answer your question, I don't believe it had any effect here. He showed no signs of issues, cognitive issues, otherwise. There was also a private investigator in this case, Mark Foster, who testified that he had visited Mrs. Miller and Francois on at least nine different occasions from August of 2019 until January of 2020, observed Francois Holterman, who worked the second shift, leave work at 12.30 a.m. and drive directly to Mrs. Miller's residence. He would then circle back a half hour, 45 minutes later, and that vehicle would still be in the driveway. And in fact, similar instances, he stopped by Tana Miller's house, which was her house, early in the morning, 5 a.m., 6 a.m., and that vehicle would be there. He observed Mr. Holterman coming out of the residence a number of times, and Mr. Miller himself observed Francois Holterman at the residence early in the morning on at least one such occasion, when his daughter stopped to get something, and observed the vehicle there late at night in June of 2021, approximately 1 a.m. As far as the nature of the activities they engaged in, Tana and Francois did a number of things together. They grocery shopped together a couple of times. Tammy did Francois' laundry. He helped with a couple of projects around the house. He attended a number of the children's activities. They went to multiple graduations together for each of their children. Francois was present at Mrs. Miller's daughter's doctor's appointment at one point. They went to a wedding and confirmation. His daughter, Francois' daughter, stayed over at the house a number of times. Francois' mother stayed with Mrs. Miller for three months in the summer of 2019. She traveled in from Arizona. They did a number of things for pleasure. They visited family. They celebrated holidays together and went on a number of trips. I believe these activities are very similar to what the court saw in the second Churchill case in 2022, and also similar to that of Edson, which was a more recent case in 2023, in which that court, the first district, found that the nature of the activity supported a de facto marriage because that couple in that case spent time together both in the home and outside the home as a couple, and that's exactly what we see here. Are you arguing that the involvement of their families makes this a little bit more than just a dating relationship? That's exactly what I'm arguing. In fact, that's something that I would get to here in the future because I do think there's another line of cases that involve a deeper commitment and permanence, the Miller court. Yes, I think the involvement of the family here, both sides, suggests a deeper relationship than just a serious dating relationship. I have one question. I'm just dug into the record enough to know this. You said that Mr. Francois's mother stayed at Ms. Miller's house for an entire summer, basically. Correct. Lived there. Correct. There's this debate over three, four days a week, five, six days a week. My mind would normally assume that he stayed there every day while his mother was there. Was there anything in the record on that? That question was not specifically asked, but again, based upon his previous statement that he had stayed there five to six nights a week, I think that's an extremely safe assumption that he was staying there while his mother was staying there. Just didn't know if there was a record. Sure. As far as the interrelation of the personal affairs, Mr. Holterman had unfettered access to the Miller residence through a garage door programed into his vehicle. He had Tammy listed as his emergency contact, both at work and on his cycling tag. He had packages delivered to the home. He watched Tammy's dog when she went out of town. On what kind of tag? He was an avid cycler, a bicycle, and so he had an emergency tag on there, you know, if he's in an accident, contacts, whomever. And that person listed was Tammy Miller. He even included Tammy's dog in his Facebook profile picture. He kept some clothes at the home. He had some tools at the home. He kept his bicycle there. In fact, he installed hooks in the garage to store the bicycle. He kept an air compressor. He also shared certain family traditions and special moments with Tammy and her children. It comes up a number of times in the record. He would spend Christmases with them and with her family, and he testified that he read a special verse that was special to the German tradition. He shared that with her family. Again, a deeper meaning. There was also the instance of Mrs. Miller's son helping sell Francois's car on Facebook. So again, their families were intertwined in a certain way. Now, the trial court determined that there was not enough interrelation and particularly perceived that there was a lack of financial commingling. I will certainly submit to the court that they did not have joint bank accounts. They did not have a joint credit card account. However, there was testimony that Tammy Miller had paid for certain flights and travel arrangements. She also testified that she was reimbursed via cash. There's very little evidence to support that, with the exception of a couple of somewhat vague deposit slips. Were those deposit slips offered and received into evidence? They were. Okay. And they're now missing? They were offered into evidence and were part of the trial court record, Your Honor. Okay. There's also testimony that Mrs. Miller helped write out the checks and deposit slips for Francois, whether it be his utilities or deposits. She wrote out those slips for him, helping him with his routine financial life. Now, again, I look back to the Walter Court because that court has stated that even if you don't have a joint account or a joint credit card, whatever it may be, even if there is not direct financial intermingling, it is still enough, if there are other aspects, to find that a de facto marriage existed. And also, the financial aspect is purely a part of it, not the sole matter that the court is to consider. As far as vacations, Tammy and Francois traveled on at least nine different occasions, again, for various reasons. Pleasure to visit family, extracurricular activities for Mrs. Miller's daughter, and they celebrated many holidays together. Four Christmases, three Thanksgivings, the Fourth of July, birthdays. They would buy each other gifts. They would incorporate their family and their traditions in that. When looking at the totality of the circumstances, in light of the Heron factors, it is our belief that all of the evidence presented, all the testimony presented, when considered, weighed in favor of the de facto marriage. Now, there is a line of cases, starting with, ironically enough, the Miller case in 2015, that state that the Heron factors are either not enough or should not be the test that is to be used here. Depending on the case, they take different positions or how strongly they go into that. The Miller case states that you must look for a deeper commitment and permanence. And I think even when you look at the evidence in that view, you see the significant length, the fact that they spent nearly every day together. And Francois himself testified that the time we'd spend together was paramount. Every chance I got, pretty much, I would be over there, is what he said. He made a home there, installing the hooks for his bicycle and storing it there, programming the garage door opener into his vehicle, involving the children, whether it be in the holidays or the trips. His mother, while staying with Mrs. Miller in her home with him, traveled with them to West Virginia to go see her daughter's national gymnastics meet. They made a home together. They traveled, they celebrated holidays, he shared the special Bible verse, all of that. Francois himself stated, I was her rock that she would lean on to do what she had to do, and we gave each other strength just being together. That is deep commitment and certainly a sign of permanence. What are we really asking in all of this hodgepodge, which is what basically is a good descriptor of these types of issues? What's the difference between friendship and marriage? Well, this is where I do think the Miller line of cases do have some merit to them, and that's not to state that they're not good case law, but I think when you do look at the deeper part of this, there was a more recent case that Justice Davenport was involved in, the Saunders case. In my opinion, that was more of a casual dating relationship because this is people that didn't see each other very frequently. I think the relationship was called volatile, but fun was the phrase that was used. There's a deeper root to this relationship, which likens it to a marriage. The fact that there was a home made together, that they shared the family within that, and that they were intertwined in a number of ways, both individually and their families. And so on that basis, we believe that the trial court's ruling was against the manifest weight of the evidence, and we ask that the ruling be reversed and an order be entered terminating the case. Questions? No questions. Thank you. You'll have time in reply. Thank you. Mr. Boland, you may respond. Your Honor. Presiding Justice Holdridge, Justices, I'm Chris Boland. I'm here to represent Tammy Miller, who isn't here because she's a school cook and had to work. In terms of the issues in this case, and the issues in any case where there are attempts to terminate maintenance because of an allegation of parties living in a quasi or existing in a quasi marriage as opposed to a dating relationship, there are myriads of facts that courts have to consider. And that's because most of the decisions that we have cited all reference the fact that every case and its facts may be different from every other case, and that unfortunately leaves no standard by which to look at things other than looking at the facts. First, we start out with the concept that the issue before you is whether Judge Bartusi made a decision that's against the manifest weight of the evidence. She made specific findings. She made a specific, orally she made those findings, and she found in four of the six herring factors, and we'll talk about that in a minute, but she found in four of those six, there was no de facto marriage. However, this court in the most recent case of Saunders, the first district in a slightly older by weeks case of Larson, and a previous case of Edson, all decided in essentially the past nine months. And the Miller case from the second district, which was decided in 2015, all say that you look at the totality of the circumstances, and all say, as did Heron itself, that we're creating this list. It's a non-exhaustive list, and it's not a checklist. In other words, you don't go through and see if there's one fact that meets that standard and make a check mark and say, aha, that's it. The length of the relationship is the first consideration. In Miller, there was a six-year relationship, and that existed on an ongoing basis. In Larson, I believe there was a four-year relationship. Saunders was a little less than two years. But Saunders reversed, this court reversed a decision by the trial court, which found that there was a quasi-marriage and not a dating relationship. So we go through that list of the Heron documents, and we'll address that shortly, but we have to come back to the fact that this is a manifest way to the evidence case. And the court has to make a decision as to whether it is based, whether this decision by Judge Bartusi is not based on the evidence, or whether it's arbitrary and unreasonable, or clearly false, or clearly erroneous. That's not what this decision is. I acknowledge there's some facts that would lean one way. I didn't hear any acknowledgment that there were a whole lot of facts that lean the other way. And when we go through the factors, we talked about length of relationship. Quite frankly, as the Larson court said from the First District, the length of the relationship becomes a lesser factor when you consider the totality of the circumstances. And that's what has happened in those three cases that I've cited, along with the Miller case. Now counsel has argued, or the appellant has argued in their brief, that Miller's an outlier. Well it may have been at the time the brief was filed, in the opinion of the appellant, it could no longer be argued that it's an outlier. Because we have the next three cases that have followed it recently. So we deal, one, with the length of the relationship, and I submit to the court that this relationship started, we have acknowledged, and my clients testified in November of 2017, that it ended in February of 2021, started again in May or August of 2021, and resumed a relationship from that point until January of 22. Was the nature of that relationship different after they started together? Absolutely. How was it different? Two ways. One, they'd previously been intimate, and that intimacy discontinued. Now I understand that the LA Supreme Court has said a sexual relationship is not a requirement for living in a continuing conjugal relationship. But more importantly, the frequency of them seeing each other went down, according to the testimony in the record, to one night a week at most. At that point, it clearly was a substantially different relationship at the time we start the hearing than it had been before. How long did this litigation last on petition to terminate maintenance? We started in January of 2022, and the decision, and I apologize, it lasted roughly a year and a half. So it started in January of 2022 after they had resumed a relationship which was non-sexual in May of 21. Actually, it started after the relationship had terminated. Okay, thank you. And so we go into that, the issue that we talked about, back to the question of whether this decision is against the manifest way of the evidence. Now, this court has adopted as a method of looking at the evidence the Heron Test, the six factors. But nowhere is this court said that those factors are the final and only consideration. One has to look at the totality of the circumstances. And while counsel says that the termination of the relationship should not be considered, that certainly wasn't the holding in the Saunders decision when the gentleman who was part of that, the third party, I guess is the best way to put it, became married approximately two months after their relationship ended. Similarly, that's not the holding of any court, is that there is a bright line number by which you can determine whether a quasi-marriage exists or an intimate dating relationship. So we go on to look at the time together. What this record shows is that of the 145 days between the beginning of the surveillance and the end of the surveillance, the private investigator saw Mr. Holderman's car parked in the driveway 20 times. However, he only saw Mr. Holderman three times. Never saw him in the house, never saw him through the window or any other ways. Of the three times he saw him, the one time was that he was in the house apparently, came out of the house approximately for 15 minutes after he got into the house, got in his car and drove away. So that's one of the times it was spotted and clearly he left. Second time is he came out of the house in an afternoon going across the street to the high school for an event with Mrs. Miller and he came back. That's the second time. The third time, confirming what Mr. Holderman testified, when he said that many times he would come home, even late at night, go into the garage, get his bicycle and go for a bicycle ride. And one of the three times the private investigator Foster saw him, that's exactly what he did. Now, of the times that Mr. Miller claimed he saw Mr. Holderman's car, I believe it was three times. And one time he came to the door, so he saw him one time. So the evidence of how often Mr. Holderman's car was present is pretty clear. The evidence as to how long it was present is not so clear because both Mr. Holderman and Mrs. Miller testified that there were times he would come home, or come to her home, he would go in and they would watch TV, have a snack and then he would leave. And that's not been refuted or in any way discredited. Did Mr. Foster prepare or written a report? He did. Was it admitted into evidence? It was, over my objection. Where is it? I assume it's somewhere in the Iroquois County Courthouse. Okay, thank you. I don't know where it is. So that's the nature of how much time they're together. There was no dispute that they have spent overnights together at least until the beginning of the trial in January of 2022, or at least until May. February when the breakup started, May when it resumed, and then after that. And yes, Mr. Holderman in answer to his first question, and if you look at the transcript before you, Mr. Holderman had a number of issues about his being able to testify. He has a brain injury, and it has affected him. He talked about how it affected him, and Tammy talked about how it affected him. And yes, he testified five to six nights when he was asked the question at the beginning of the deposition, and at the end of the deposition, he said, well, maybe three to four is a more accurate number of nights. Not a big issue, but that's the way the testimony. In the trial, he testified three to four. So assuming that's the top end, Tammy had testified previously one to two nights a week, had previously also testified three to four. So assuming that's how often they saw each other on a weekly basis, I would argue that that is consistent with the number of times and the relationship that is identified in the three cases we talked about. There's a reference to grocery shopping. They go grocery shopping together. Yeah, they do, and they have separate carts, and the food from Tammy's cart goes home to her house according to the testimony, and the food from Mr. Holderman's cart goes home to his apartment. So if that's enough to create a quasi-marriage by the fact that you go to the grocery store at the same time, I don't think that's what it's a holding of any other case. Then there's talk about how much time they spent together on trips, holidays, and otherwise. First, let's talk about holidays, and that's a later criteria, but I think it should be discussed here as well. Over the course of the three and a half years, Mr. Holderman and Tammy celebrated Christmas according to the docket and testimony three times together. They did not buy Christmas gifts for each other. They did not buy Christmas gifts for the children, each other's children, and in fact, they had no financial interaction. So the issue before this court, and I'm jumping ahead, there is no financial connection in this case of any kind. All that happened between them on their finances is they were separate accounts, separate charge cards. Neither had access to either of any accounts of the other. She did fill out some checks for him, just as any friend would do if the person is unable because of a brain injury to handwrite correctly. So she did do that, and yes, she put trips on her credit card, and the unrebunded testimony is he reimbursed her for every time she put a charge on, she reimbursed him for every time for her share of the expenses. There is no financial connection between these two folks. Was the reimbursement between the parties made by cash or by check? Typically cash, and Tammy testified regarding why she was okay with cash, and that was because she had a budget system she called the envelope system. Not very sophisticated, but she would put the cash as she accrued it during the month for all of her bills, whether it be a water bill, a gas bill, an electric bill, payment on a credit card, all of those things. And that's what she, when she would receive cash from Francois, she would put that in the envelopes. So I don't believe there's any evidence to the contrary in this record. In summary, the Judge Bartusi found that there was insufficient evidence to show that these parties were involved in anything but an intimate dating relationship. She made that finding based upon the evidence that she cited, and we would ask you to affirm her decision. Thank you very much, Your Honor, I appreciate it. Counsel may reply. Thank you, Your Honor. First, I just want to correct one issue or one timing point. Justice Davenport has asked the timing of the starting of the hearing. The hearing, in fact, the first testimony, Mrs. Miller being the first witness, started in August of 2021. Mr. Holterman testified in the next court date, which was February of 2022. And that is when he first brought up that the parties had, or Mrs. Miller and Francois had broken up in January of 2022. As far as the argument regarding the termination or the ending of the relationship, I certainly don't suggest the court should disregard that entirely. But simply put, I think it should not negate the other factors that this court may consider, whether it be the Heron factors, the Miller test, whatever it may be, simply because a relationship ends, I don't think it negates the seriousness or the commitment therein. And again, this is mentioned specifically in the Walter court because in that case, the Kays ended the relationship with the Paramore at the time the petition was filed. And the court in that case stated that that in itself does not negate the other factors or certainly the length of the relationship. And as far as the Francois' vehicle being at the home and whether it be the PI or Mr. Miller not seeing Francois in the home, not peering in the windows or anything like that, which you can understand is probably improper for anybody to do. Francois and Tammy were both specifically asked by me on multiple occasions, was the vehicle, Francois' vehicle ever kept at Tammy's residence if he was not there? Both answered no. So this was not a situation where Francois would park his vehicle there and then ride his bicycle over to his apartment. He may have gone on bicycle rides, but the evidence, the testimony from both Mr. Miller and from the private investigator would support that he was coming back. That vehicle was seen there not only late in the evening, but early in the morning on a number of occasions, random occasions too, that the private investigator selected. I think, as I stated earlier, there are certainly a line of cases, particularly in the last, even in the last few weeks, that take the inherent factors and then add something to that. And that being that deeper commitment or signs of permanence, which the Miller court first suggests. And I think when you look at the facts in this case, not using the inherent factors necessarily as a checklist, but you do see all of that here. But you also see signs of deeper commitment, the enmeshing of their families, their children, his mother staying there, going on trips with them. Counsel, did Francois have minor children? Yes. Did he ever exercise parenting time with the minor children in the home of Mrs. Miller? Yes. And in fact, his daughter, I believe at the time he had one minor daughter, he had older children as well, but the one minor daughter stayed at Mrs. Miller's residence. Forgive me, I believe the testimony was approximately 10 times. And again, we also have his mother staying there for a period of approximately three months, an entire summer, going on a trip with the two of them and Tammy's daughter. So again, there was an enmeshment of their lives, their family, their day-to-day, all of that. So there are signs of deeper commitment and permanence here, in addition to the inherent factors that are to be considered. And so on that basis, we would submit that Judge Martucci's ruling should be overturned and we'd ask that the case be remanded for an order to be entered terminating maintenance. Thank you, Counsel. Thank you, Counsel, both for your arguments in this matter this afternoon. It will be taken under advisement. A written disposition shall issue from this court.